**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

GEORGE B. KIM, DOUGLAS KIM, and
MICHAEL KIM,

       *Plaintiffs*,

v.

H GUYS, LLC, an Illinois limited liability
company; H GUYS, LLC CHICAGO, an
Illinois limited liability company; STEVE H.
CHONG; VINCENT T. TAN; and MEGAN
M. CHONG,

      *Defendants*.

Civil Action No. 1:20-cv-_____

## COMPLAINT

Plaintiffs George B. Kim, Douglas Kim and Michael Kim (collectively, the "Plaintiffs"), through their undersigned counsel, for their complaint against Defendants H Guys, LLC; H Guys Chicago, LLC; Steve H. Chong; Vincent T. Tan; and Megan M. Chong (collectively, the "Defendants") allege as follows:

### INTRODUCTION

1.     Steve Chong, Vincent Tan and Megan Chong (the "Individual Defendants") are fraudsters. They are also dishonest and disloyal managing members of H Guys Chicago, LLC. This action is brought to remedy the Individual Defendants': (i) duplicitous conduct in soliciting Plaintiffs' investment in a company the Individual Defendants formed to operate and manage the first Halal Guys franchise in Chicago, (ii) gross negligence and willful misconduct in the management and operation of the franchise restaurant, and (iii) misappropriation of investor funds for their own personal use.

2.      The Individual Defendants own and operate H Guys, LLC (the "Management Company"). Through this umbrella company, and a series of related limited liability companies, including H Guys Chicago, LLC (the "Company"), the Individual Defendants were charged with, and responsible for, managing certain Halal Guys franchise restaurants in Chicago. Plaintiffs were investors in the Halal Guys restaurant located on Division Street, which was indirectly managed by the Management Company and directed owned and operated by the Company.

3.      The Individual Defendants fleeced Plaintiffs and other investors by, among other things, fraudulently inducing them to invest based on numerous false and misleading statements, including that: (i) the Management Company had entered into a franchise agreement with The Halal Guys Franchise Inc. (the "Franchisor"), (ii) the franchise agreement granted exclusivity rights to the Management Company to develop a number of Halal Guys franchises in Chicago, and (iii) that the Individual Defendants were uniquely qualified and competent to operate fast-food restaurants like the Halal Guys. Based on these and other representations—all of them false and misleading, and known to be false and misleading by the Individual Defendants—Plaintiffs made substantial equity investments in the Company.

4.      Plaintiffs have since learned, through their own diligence and investigation, that at the time they invested in the Company: (i) the Management Company had not even secured a binding franchise agreement from the Franchisor and (ii) the Management Company had not been granted any form of exclusivity by the Franchisor. Furthermore, after eventually entering into a franchise agreement with the Franchisor and later obtaining very limited exclusivity rights, the Individual Defendants grossly mismanaged the Company, which culminated in the Franchisor terminating the franchise agreement for cause. Plaintiffs have also discovered that the Individual

Defendants appropriated investor funds for their own person use and benefit. All of this conduct has resulted in a near total loss of Plaintiffs' investments in the Company.

5.      After months of contentious interactions with the Individual Defendants in an effort gain visibility into the performance of their investments, Plaintiffs confronted the Individual Defendants with their fraud and gross mismanagement of the restaurants and threatened to sue for damages and equitable relief. As a result, on April 15, 2019, the Individual Defendants caused the Management Company to enter into agreements with Plaintiffs providing for the purchase of their membership interests by the Management Company at a discounted rate—i.e., refund a percentage of Plaintiffs' equity investments in exchange for their membership interests (the "Membership Interest Repurchase Agreements"). The Membership Interest Repurchase Agreements required the Management Company to make a series of six (6) installment payments to Plaintiffs.

6.      The Management Company has breached the Membership Interest Repurchase Agreements by, among other things, failing to make even one of the installment payments required by such agreements. Upon information and belief, the Individual Defendants never intended to cause the Management Company to comply with the terms of the Membership Interest Repurchase Agreements. Instead, the Individual Defendants entered into the Membership Interest Repurchase Agreements for the sole and fraudulent purpose of divesting Plaintiffs of their membership interests in the Company in an effort to extinguish Plaintiffs' fiduciary claims and to shield themselves from any further liability to Plaintiffs.

7.      In bringing this action, Plaintiffs seek: (i) the return of their equity investments; (ii) an accounting of the Company; (iii) compensatory damages from Defendants as a result of their fraud, conversion, and breaches of fiduciary duties; (iv) punitive damages from Defendants as a result of their fraud, conversion, and breaches of fiduciary duties; (v) disgorgement of any profit

or benefit Defendants have received as a result of their fraud and breaches of fiduciary duties; (vi) a declaratory judgment that the Membership Interest Repurchase Agreements are void; and, alternatively, (vii) to enforce the terms of the Membership Interest Repurchase Agreements, including payment of all amounts due and owing.

## PARTIES

8.      Plaintiff George B. Kim is an investor in the Company who resides in, and is a citizen of, the State of New York.

9.      Plaintiff Douglas Kim is an investor in the Company who resides in, and is a citizen of, the State of California.

10.     Plaintiff Michael Kim is an investor in the Company who resides in, and is a citizen of, the State of New York.

11.     Defendant H Guys, LLC is an Illinois limited liability company with its principal place of business in Elk Grove Village, Illinois (County of Cook). H Guys, LLC is the managing member of H Guys Chicago, LLC.

12.     Defendant H Guys Chicago, LLC is an Illinois limited liability company with its principal place of business in Elk Grove Village, Illinois (County of Cook). H Guys Chicago, LLC previously owned and operated the Halal Guys franchise restaurant on Division Street in Chicago.

13.     Defendant Steve H. Chong is a member of the Management Company and is the Chief Executive Officer of the Company. Upon information and belief, Chong resides in, and is a citizen of, Illinois.

14.     Defendant Vincent T. Tan is a member of the Management Company and the Chief Operating Officer of the Company. Upon information and belief, Tan resides in, and is a citizen of, Illinois.

4828-5384-1078, v. 1

15. Defendant Megan M. Chong is a member of the Management Company and the Chief Financial Officer of the Company. Upon information and belief, Chong currently resides in Hong Kong but is a citizen of Illinois.

## JURISDICTION AND VENUE

16. This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

17. Venue is proper in this judicial district pursuant to 28 U.S.C. 1391(b)(2) because a substantial part of the events giving rise to this action occurred within this judicial district.

## FACTS COMMON TO ALL COUNTS

18. The Halal Guys, originally founded in New York City in 1990, is one of the largest and most well-known ethnic fast food chains in the United States. (A true and accurate copy of the Private Placement Memorandum dated as of October 29, 2014 is attached as Exhibit A.)

19. The Halal Guys serves Mediterranean style chicken and gyro (beef or lamb cooked on vertical, rotating poles) rice plates, adorned with their now famous seasoned white sauce and hot red sauce. Given its tremendous success, The Halal Guys has evolved from a street food stand to a fast food restaurant and franchisor.

20. Due to the increasing appeal and popularity of The Halal Guys brand, Halal Guys franchisees now serve customers in over 200 restaurants throughout the United States (including in Las Vegas, Nevada; Los Angeles, California; Washington, D.C.; Atlanta, Georgia; Chicago, Illinois; Philadelphia, Pennsylvania; and Houston, Texas) and internationally (Kuala Lumpur, Malaysia; Manila, Philippines; Toronto, Canada; and Jakarta, Indonesia).

**Defendants' False and Misleading Representations**

21.     Attempting to seize on the burgeoning popularity of The Halal Guys restaurants, the Individual Defendants decided to bring the brand to the midwestern United States by opening the first The Halal Guys franchises in the Chicagoland area. To that end, they formed the Management Company to act as the managing member of certain entities that would own and operate one or more The Halal Guys restaurants to be franchised and opened in the Chicagoland area.

22.     Holding themselves out as a "strong and comprehensive management team" and an "all-star cast of strategic advisors," the Individual Defendants approached Plaintiffs and solicited their investment of significant sums of money into the Company, which they had formed to operate the first Halal Guys franchise in Chicago. (A true and accurate copy of that certain Letter of Intent dated October 20, 2014, setting forth the terms for an investment in the Company proposed to the Plaintiffs, is attached as Exhibit B.)

23.     As part of their investment pitch, including statements made in that certain H Guys Chicago Investor Presentation (the "Investor Presentation"), the Individual Defendants touted their "16 years in the restaurant business," "7 years in global logistics," and "9 years in consulting and business development" as "competitive advantages needed to succeed in the challenging franchise restaurant business." The Individual Defendants also promised to bring an "in depth understanding of the Chicago-land and Malaysia markets," "[l]ocal expertise and connections with contractors and municipalities for smooth business set up and execution of operations," and "[u]nderstanding of market competition and dynamics of locations and potential customer targets." (H Guys Chicago Investor Presentation at 18, a true and accurate copy of which is attached as Exhibit C.)

- 6 -

24.     The Individual Defendants initially proposed an investment that contemplated one The Halal Guys restaurant located on Division Street in Chicago (the "Gold Coast Location"), which would be the first The Halal Guys restaurant in the Chicagoland area and the first Halal Guys franchise outside of New York.

25.     In addition to the representations the Individual Defendants made about their ability to successfully operate a The Halal Guys franchise, the Individual Defendants represented to Plaintiffs that they had garnered certain exclusivity rights from the Franchisor, which would provide them—or so they asserted—with a significant and material competitive advantage in the relevant franchise restaurant market.

26.     Specifically, the Individual Defendants represented to Plaintiffs that "the parent of the Company has exclusive rights" from the Franchisor "to several neighborhoods within the Chicagoland area" for "a minimum of 10 years." (Exhibit B.) In connection with the exclusive rights that the Individual Defendants had purportedly secured on behalf of the Management Company, the Individual Defendants further represented to Plaintiffs that Plaintiffs would have "priority to invest in additional stores beginning in Year 2," including the "[e]arly securing of shares in Store #2 (up to 10 shares)," which was "due to open by Summer 2016." (Exhibit B.)

27.     This representation regarding exclusivity rights was reinforced by the Individual Defendants in myriad conversations and exchanges between and among Plaintiffs and the Individual Defendants as a further inducement for Plaintiffs to invest in the Company. Specifically, Steven Chong confirmed to George Kim that H Guys had "exclusive rights to Chicago."

28.     In reliance on these and other representations made by the Individual Defendants, including those in the Investor Presentation, that certain Letter of Intent for Halal Guys Chicago dated October 20, 2014 (the "October 2014 LOI"), and that certain Private Placement

Memorandum dated on October 31, 2014 (the "Original PPM"), Plaintiffs collectively invested several hundred thousand dollars in the Company.

29. Specifically, on or about October 31, 2014, George Kim executed a subscription agreement pursuant to which he acquired 5.0 units (or 20% of the issued and outstanding membership interests in the Company) in exchange for $200,000. (A true and correct copy of that certain Irrevocable Subscription Agreement—Power of Attorney dated as of October 31, 2014 is attached as Exhibit D.) On or about November 3, 2014 Michael Kim executed a subscription agreement pursuant to which he acquired .5 units (or 2 % of the Company's outstanding membership units) in exchange for $20,000. (A true and correct copy of that certain Subscription Agreement dated as of November 3, 2014 is attached as Exhibit E.) Similarly, on or about February 19, 2015, Douglas L. Kim executed a subscription agreement pursuant to which he acquired 1.5 units (or 6 % of the Company's outstanding membership units) in exchange for $60,000 (A true and correct copy of that certain Subscription Agreement dated as of February 19, 2015 is attached as Exhibit F.)

30. In reality, and completely unbeknownst to Plaintiffs, neither the Management Company, the Company, nor the Individual Defendants had been granted any franchise or franchise rights by the Franchisor at the time the Individual Defendants solicited Plaintiffs' investment or at the time Plaintiffs George Kim and Michael Kim funded their investments in the Company.

31. The Individual Defendants lied to Plaintiffs George Kim and Michael Kim about having been granted a franchise by the Franchisor. Not only did they represent that a franchise agreement was then in effect, but when George Kim specifically asked to review it before he invested, Megan Chong rebuffed his request and falsely stated, "I am sorry, but we cannot disclose

the [franchise agreement] as we agreed with Franchisor we will not share it with anyone, they made us agree to this ☹." (A true and correct copy of M. Chong's email to M. Kim dated October 31, 2014 is attached as Exhibit G.)

32.     The Management Company did not enter into a franchise agreement with the Franchisor until a month later, on November 25, 2014, when it executed that certain The Halal Guys Franchise Agreement (the "Franchise Agreement"). On the same date, the Management Company also entered into that certain The Halal Guys Franchise Inc. Multi-Unit Operator Agreement (the "Multi-Unit Agreement"). Then, and only then, did the Franchisor grant the Management Company a license to establish and operate five (5) The Halal Guys restaurants within a designated territory.

33.     Moreover, and directly contrary to the Individual Defendants' representations, it was not until five months later, on March 3, 2015, pursuant to that certain Second Addendum to the Multi-Unit Operator Agreement (the "Addendum"), that the Management Company was given a limited territory within which only the Management Company could operate The Halal Guys restaurants. However, the exclusivity granted to the Management Company by the Franchisor under the Addendum was hardly the kind of exclusivity that the Individual Defendants had led Plaintiffs to believe they had received.

34.     Specifically, the exclusivity granted to the Management Company was limited to "five chosen trade areas within radius protection of 1/4 mile radius in urban areas and up to 2 miles in suburban locations"—which are to be granted at the Franchisor's discretion. (Confidential Private Placement Memorandum at 5, a true and correct copy of which is attached as Exhibit H .) The actual "exclusivity" granted is not the exclusivity that the Individual Defendants represented it to be, which was that H Guys had "exclusive rights to Chicago."

35.     In an attempt to sweep these material misrepresentations under the rug and insulate themselves from liability by having Plaintiffs ratify new and different disclosures that would govern their investment, the Individual Defendants transmitted for signature to Plaintiffs a wholly revised Confidential Private Placement Memorandum dated September 7, 2016 (the "Revised PPM").

36.     The Revised PPM included numerous material changes to the Original PPM, including a litany of references to, and detailed description of some of the terms of, the Franchise Agreement, none of which were present in the Original PPM. Furthermore, the Revised PPM also included a revised operating agreement of the Company (the "Revised Operating Agreement"), which included several terms that were not included in the original Operating Agreement.

37.     Believing that they served no legitimate purpose ex post facto, Plaintiffs refused to execute the Revised Subscription Agreement or the Revised Operating Agreement.

**The Individual Defendants Grossly Mismanaged
the Company, the Restaurants and Investor Money**

38.     The Management Company's first The Halal Guys restaurant, located at 49 W. Division Street (the "Gold Coast Location"), opened in August 2015[1], just west of the intersection of Rush and Division. As stated above, the Gold Coast Location was the first The Halal Guys franchise opened outside of New York City. It generated significant attention in the press and was poised for great success, including by keeping late night hours specifically aimed at capturing foot traffic generated by several nearby bars and night clubs.

39.     In 2017, the Management Company opened another Halal Guys store in the Chicago Loop at 172 North Wabash (the "Loop Location"). The Loop Location was also managed and operated by an affiliate of the Management Company.

---

[1]  https://www.chicagofoodmagazine.com/the-halal-guys-chicago-grand-opening

4828-5384-1078, v. 1

40.     The Gold Coast Location and the Loop Location were followed by yet another store located at 1415 North Milwaukee Avenue (the "Wicker Park Location" and, together with the Gold Coast Location and the Loop Location, the "Restaurants"), which opened, upon information and belief, around April 2018.

41.     Notwithstanding the popularity of The Halal Guys brand, the incredible anticipation generated by the rollout of The Halal Guys franchise in Chicago, and the strategic locations staked out for each of the Restaurants, the Individual Defendants, almost immediately after opening the Gold Coast Location, began breaching the duties they owed their investors.

42.     The Individual Defendants breached their fiduciary duties by wantonly failing to immerse themselves in the management and operations of the Company and, instead, turning over all operational responsibilities to personnel who were not competent to manage a fast-food franchise restaurant.

43.     The Individual Defendants, thereby abdicated their responsibilities in favor of lower-level employees who did not have the sophistication or expertise that the Individual Defendants had led Plaintiffs to believe would be deployed to manage the operations at the Gold Coast Location and at other locations the Individual Defendants intended to open.

44.     Moreover, despite the Individual Defendants' representations, in terms of their experience, training, and know-how, the Company was unable to achieve any level of profitability with the Gold Coast Location. Despite various investor updates from the Individual Defendants, which blamed the abysmal performance on the Franchisor rather than their own incompetence, the Individual Defendants were unable to adequately or properly manage the Restaurants, including the Gold Coast Location.

4828-5384-1078, v. 1

45.     Unbeknownst to Plaintiffs, by April 2018, the operations and oversight at the Restaurants had so deviated from the Franchisor's standards and become so dysfunctional that the Management Company had no other choice but to reach out to the Franchisor to save the Restaurants. These failures were attributable in part to the fact that rather than overseeing the operations or paying attention to the business, Megan Chong was still working a full-time corporate job in Hong Kong and Steven Chong was devoting his efforts to another job as well as a startup company that manufactures golf balls, facts that were not disclosed to Plaintiffs and contrary to what Plaintiffs were led to believe.

46.     Consequently, on April 29, 2018, the Franchisor, the Management Company and the Individual Defendants entered into a Step-In Management Acknowledgement Agreement, pursuant to which the Franchisor agreed, at the Management Company and the Individual Defendants' request, to exercise certain of its "step-in" rights in order to operate and manage the Restaurants.

47.     After approximately one month of remedial measures and operation controls having been implemented by the Franchisor, the financial and operational performance of the Restaurants substantially improved. By the end of May 2018, responsibility for operating the Restaurants was turned back over to the Management Company.

48.     Not long thereafter, however, the Restaurants entered into a steep and irreversible decline, both operationally and financially. Specifically, the Gold Coast Location, the Loop Location and the Wicker Park Location faced varying allegations of sanitation issues. These issues included food handling, cleanliness, food safety, and temperature of food storage devices. As a consequence, the Restaurants failed numerous health department inspections conducted by the Chicago Department of Public Health, including at least two failed inspections of the Gold Coast

Location between May 29, 2018 and April 8, 2019. (True and accurate copies of the Reports from the Chicago Department of Public Health are attached as Exhibit I.)

49.     In addition, the Gold Coast Location, the Loop Location and the Wicker Park Location failed numerous operational inspections conducted by the Franchisor during the time the Individual Defendants operated the Restaurants and similarly failed numerous food safety audits conducted by the Franchisor. (True and accurate copies of Reports from the Franchisor are attached as Exhibit J.) Specifically, the Franchisor cited various instances of unsafe and improper operation of the Restaurants, including unlabeled and undated food, expired food products, incomplete temperature logs, sanitation and cleanliness issues, and refrigerators operating at excessively high temperatures.

50.     Beyond the sanitary and health issues that the Defendants knowingly allowed to fester at the Restaurants, they sublet space within the Loop Location to the "Tea Ninja," a tea merchant that had no affiliation with The Halal Guys, in blatant violation of the terms of the Franchise Agreement. The Defendants also failed to pay the Franchisor amounts for Royalty Fees and Marketing Fund Contributions, both of which were required under the Franchisor Agreement. Finally, without the Franchisor's knowledge or consent, the Management Company and the Individual Defendants furtively closed the Wicker Park Location at the end of May 2019.

**As a Result of the Individual Defendants' Gross Mismanagement and Willful Neglect of the Restaurants, the Franchisor Terminates the Franchise Agreement**

51.     Consequently, and as a result of the foregoing, the Franchisor—not surprisingly— declared a default under the Franchise Agreement and informed the Management Company and the Individual Defendants that they had violated the Franchise Agreement in numerous respects, including, but not limited to: (i) their failure to comply with applicable health and safety standards,

- 13 -

(ii) their unauthorized co-branding of the Loop Location, and (iii) their failure to pay all Royalty Fees and Marketing Fund Contributions, and all other past due amounts.

52.     Despite the Franchisor's notice to the Management Company and the Individual Defendants, the Management Company and the Individual Defendants failed to cure the defaults or rectify the various issues outlined in the Franchisor's notice of default. Accordingly, by letter dated July 18, 2019, the Franchisor notified the Management Company and the Individual Defendants that it was terminating the Franchise Agreement and sought to wind down the relationship in a timely and efficient manner. (A true and correct copy of the Franchisor's Notice of Termination dated July 18, 2019 is attached as Exhibit K.)

53.     As a result of the foregoing, the Management Company and the Individual Defendants caused the Gold Coast Location and the Loop Location to cease operations, further exacerbating the harm to the Company and damage to the Plaintiffs.

54.     Despite all of the foregoing, the Individual Defendants paid themselves handsome management fees to oversee and manage the Company's operations, including through 2019. Upon information and belief, between management fees and distributions, the Individual Defendants have paid themselves in excess of $300,000. Such fees and distributions have not been earned and, based on the conduct alleged above, should be disgorged.

### The Individual Defendants Cause the Management Company to Enter Into Phony Repurchase Agreements with Plaintiffs

55.     In early 2019, Plaintiffs confronted the Individual Defendants concerning their fraudulent representations to induce Plaintiffs to invest in the Company; their gross negligence and willful neglect in the management and operation of the Company; and the termination of the Franchise Agreement. Plaintiffs advised the Individual Defendants of their intent to file suit and seek all available remedies in law and equity.

- 14 -

56.     Shortly thereafter, in April 2019, the Individual Defendants proposed repurchasing Plaintiffs' membership interests in the Company at a discount. Accordingly, the Individual Defendants caused the Management Company to enter into the Membership Interest Repurchase Agreements with Plaintiffs, pursuant to which the Management Company promised to repay Plaintiffs their entire investment, minus 10%, in six installment payments beginning on April 15, 2019 with the purchase price being paid in full on June 30, 2020. (Membership Interest Repurchase Agreements §§ 2.2.1-2.2.2.)

57.     Pursuant to Section 2.2 of the Membership Interest Repurchase Agreement George Kim executed, the Management Company agreed to a purchase price in the aggregate amount of $180,000 for George Kim's membership interests in the Company. Specifically, the Management Company agreed to pay George Kim $180,000 "in six (6) installments beginning April 15, 2019, and then on June 30, 2019, September 30, 2019, December 31, 2019, March 31, 2020, with the obligation to repay the Purchase Price in full by June 30, 2020." (A true and correct copy of G. Kim's Repurchase Agreement is attached as Exhibit L.)

58.     Pursuant to Section 2.2 of the Membership Interest Repurchase Agreement Douglas Kim executed, the Management Company agreed to a purchase price in the aggregate amount of $54,000 for Douglas Kim's membership interests in the Company. Specifically, the Management Company agreed to pay Douglas Kim $54,000 "in six (6) installments beginning April 15, 2019, and then on June 30, 2019, September 30, 2019, December 31, 2019, March 31, 2020, with the obligation to repay the Purchase Price in full by June 30, 2020." (A true and correct copy of D. Kim's Repurchase Agreement is attached as Exhibit M.)

59.     Pursuant to Section 2.2 of the Membership Interest Repurchase Agreement Michael Kim executed, the Management Company agreed to a purchase price in the aggregate amount of

$18,000 for Michael Kim's membership interests in the Company. Specifically, the Management Company agreed to pay Michael Kim $18,000 "in six (6) installments beginning April 15, 2019, and then on June 30, 2019, September 30, 2019, December 31, 2019, March 31, 2020, with the obligation to repay the Purchase Price in full by June 30, 2020." (A true and correct copy of M. Kim's Repurchase Agreement is attached as Exhibit N.)

60.     To date, however, the Management Company has failed to make even a single payment to any of the Plaintiffs under any of the Membership Interest Repurchase Agreements. Upon information and belief, the Individual Defendants never intended to pay, and never intended to cause the Management Company to pay, Plaintiffs anything for their membership interests in the Company. Instead, upon information and belief, the Individual Defendants sought to surreptitiously strip Plaintiffs of their standing to pursue breach of fiduciary duty claims against them in relation to the gross negligence in the management and operation of the Company.

61.     To make matters worse, it appears, upon information and belief, that the Individual Defendants misappropriated a portion of Plaintiffs' equity investment for their own personal use. Specifically, the Company's balance sheet dated December 31, 2015, reflects that the Individual Defendants loaned themselves $57,832.74 from Company funds. Similarly, the Company's cash flow statement dated December 31, 2015 reflects that the Individual Defendants loaned themselves $293,546.26. (Copies of the Company's Balance Sheet and Statement of Cash Flows dated as of December 31, 2015 are attached as Exhibit O and Exhibit P.)

## CLAIMS FOR RELIEF

### I.   FRAUD
### (Against All Defendants)

62.     Plaintiffs repeat and incorporate by reference, as if fully set forth herein, the allegations included in Paragraphs 1 through 61.

- 16 -

63.     Defendants made numerous false statements of material fact.

64.     Defendants knew that the statements they made were materially false and misleading.

65.     Defendants made the false statements with the intent of inducing Plaintiffs to invest in the Company.

66.     Plaintiffs justifiably relied on the false and misleading statements made by Defendants.

67.     Plaintiffs have suffered real and concrete damages as a result.

## II.  BREACH OF FIDUCIARY DUTY
### (Against H Guys, LLC)

68.     Plaintiffs repeat and incorporate by reference, as if fully set forth herein, the allegations included in Paragraphs 1 through 61.

69.     Plaintiffs held minority membership interests in the Company, which the Management Company was responsible for managing and operating.

70.     Consequently, the Management Company owed fiduciary duties to Plaintiffs.

71.     The Management Company, as outlined in detail above, breached its duties to Plaintiffs in real and significant ways.

72.     The Management Company's breaches of their fiduciary duties to Plaintiffs were the direct and proximate cause of Plaintiffs' damages.

## III.  AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (Against the Individual Defendants)

73.     Plaintiffs repeat and incorporate by reference, as if fully set forth herein, the allegations included in Paragraphs 1 through 61.

- 17 -

74. The Individual Defendants were fully aware and cognizant of the fiduciary duties the Management Company owed to Plaintiffs.

75. The Individual Defendants were at all times aware of their role as part of the overall tortious activity at the time they assisted the Management Company in breaching the fiduciary duties it owed Plaintiffs.

76. The Individual Defendants knowingly and substantially facilitated the Management Company's breaches of the fiduciary duties it owed Plaintiffs.

77. The Individual Defendants conduct in facilitating the Management Company's breaches of its fiduciary duties to Plaintiffs was a direct and proximate cause of Plaintiffs' damages.

## IV. DECLARATORY JUDGMENT
### (Against H Guys, LLC)

78. Plaintiffs repeat and incorporate by reference, as if fully set forth herein, the allegations included in Paragraphs 1 through 61.

79. An actual, substantial and justiciable controversy exists between Plaintiffs and the Management Company regarding the validity of the Membership Interest Purchase Agreements.

80. Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, Plaintiffs request that this Court declare that the Membership Interest Purchase Agreements are null and void.

## V. BREACH OF CONTRACT
### (In the Alternative and Against H Guys, LLC)

81. Plaintiffs repeat and incorporate by reference, as if fully set forth herein, the allegations included in Paragraphs 1 through 61.

82. On April 15, 2019, Plaintiffs entered into the Membership Interest Repurchase Agreements with the Management Company.

4828-5384-1078, v. 1

83.     Pursuant to Section 2.1 of the Membership Interest Repurchase Agreements, Plaintiffs agreed to sell, and the Management Company agreed to repurchase, Plaintiffs' membership interests in the Company.

84.     The Management Company has breached its obligation under the Membership Interest Purchase Agreements by, among other things, failing to remit payments to Plaintiffs under the installment schedule contemplated by those agreements.

85.     As a direct and proximate result of the Management Company's breaches of the Membership Interest Purchase Agreements, Plaintiffs have incurred costs and damages, including attorneys' fees, and will incur future costs and damages in an amount to be proved at trial.

## VI. ANTICIPATORY BREACH
### (In the Alternative and Against H Guys, LLC)

86.     Plaintiffs repeat and incorporate by reference, as if fully set forth herein, the allegations included in Paragraphs 1 through 61.

87.     The Management Company has, through its conduct, unequivocally and without justification, renounced its duty to perform under the Membership Interest Repurchase Agreements.

88.     The Management Company's manifestation of its intention not to perform under the terms of the Membership Interest Repurchase Agreements justifies the repudiation of those agreements.

## VII.   UNJUST ENRICHMENT
### (Against All Defendants)

89.     Plaintiffs repeat and incorporate by reference, as if fully set forth herein, the allegations included in Paragraphs 1 through 61.

- 19 -

90.     Defendants' willful and grossly negligent conduct has resulted in Defendants obtaining money, which in equity and good conscience, belongs to Plaintiffs. Specifically, the substantial sums Plaintiffs invested in the Company were unlawfully diverted by the Individual Defendants for the personal use, which is unconscionable under the law and, as such, resulted in Defendants' unjust enrichment.

## PRAYER FOR RELIEF

WHEREFORE, for the foregoing reasons, Plaintiffs request that the Court enter judgment in favor of Plaintiffs and against Defendants for the following relief:

(i)     Judgment in Plaintiffs' favor and against Defendants on all causes of action alleged herein;

(ii)    Damages in an amount to be proven at trial;

(iii)   Punitive, exemplary or double damages, as applicable;

(iv)    All amounts unjustly obtained by Defendants;

(v)     A constructive trust over all proceeds and assets acquired as a result of Defendants' conduct alleged herein;

(vi)    Attorneys' fees and costs; and

(vii)   Such other and further relief as this Court deems just and equitable.

## JURY DEMAND

Plaintiffs demand a trial by jury, in accordance with Federal Rule 38, on any issue triable of right by a jury.

4828-5384-1078, v. 1

Dated: June 18, 2020

By:_____  s/ John J. Scharkey_____
John J. Scharkey
Ana R. Bugan
Lucas B. Terna
SWEENEY, SCHARKEY & BLANCHARD LLC
230 West Monroe Street
Suite 1500
Chicago, Illinois 60606
Tel. (312) 384-0500

*Counsel for Plaintiffs George B. Kim,*
*Douglas Kim and Michael Kim*

## INDEX OF EXHIBITS

A.      Private Placement Memorandum dated as of October 29, 2014.

B.      Letter of Intent for Halal Guys Chicago dated October 20, 2014.

C.      H Guys Chicago Investor Presentation dated October 2014.

D.      Subscription Agreement dated October 31, 2014.

E.      Subscription Agreement dated November 3, 2014.

F.      Subscription Agreement dated February 19, 2015.

G.      M. Chong Email to M. Kim dated October 31, 2014.

H.      Confidential Private Placement Memorandum dated September 7, 2016.

I.      Reports from Chicago Department of Public Health.

J.      Reports from Franchisor dated July 9, 2019.

K.      Franchisor's Notice of Termination dated July 18, 2019.

L.      G. Kim Repurchase Agreement dated as of April 15, 2019.

M.      D. Kim Repurchase Agreement dated as of April 15, 2019.

N.      M. Kim Repurchase Agreement dated as of April 15, 2019.

O.      Balance Sheet dated as of December 31, 2015.

P.      Statement of Cash Flows dated as of December 31, 2015.

4828-5384-1078, v. 1